## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Jimmy Reiss, (M44700),       )
                                   )
           Petitioner,      )
                                   )     Case No. 21 C 50296
      v.                   )
                                   )     Hon. Iain D. Johnston
Melinda Eddy, Warden,      )
Taylorville Correctional Center,     )
                                   )
          Respondent.     )

## <u>MEMORANDUM OPINION AND ORDER</u>

Petitioner Jimmy Reiss, a prisoner at the Taylorville Correctional Center, brings this habeas corpus action under 28 U.S.C. § 2254 challenging his 2014 convictions for predatory criminal sexual assault and aggravated criminal sexual abuse from the Circuit Court of the Sixteenth Judicial Circuit in DeKalb County, Illinois. (Dkt. 2.) His convictions stemmed from the allegations of G.S., a seven-year-old girl diagnosed with Asperger's Syndrome and Attention Deficit Hyperactivity Disorder (ADHD). G.S. was sleeping over at her aunt's house with her cousins when Petitioner, her aunt's fiancé, climbed into the lofted bed where she was sleeping, pulled down her pants, digitally penetrated her vagina, licked her vagina and anus, and sucked on her feet. G.S. recounted the abuse to her mother, to an emergency room physician, to a forensic interviewer, and to the jury at each of Petitioner's trials.

Petitioner's first trial resulted in a mistrial because the jury could not reach a unanimous verdict. His second trial resulted in convictions on both of the charged sexual offenses. Petitioner attributes the difference in outcome to the ineffective assistance of his trial attorney in the handling of State witness Elba Karim, a clinical professional counselor who diagnosed G.S. with Post-

Traumatic Stress Disorder (PTSD) following the sexual abuse. Karim was called to testify as an expert in child psychology and trauma at the second trial.

On postconviction appeal, the state appellate court held that trial counsel's performance was objectively unreasonable where he failed to obtain G.S.'s past health records that revealed a prior PTSD diagnosis, consult with an expert on Karim's anticipated testimony, and effectively cross-examine Karim on her qualifications and ability to diagnosis G.S. *People v. Reiss*, 2020 IL App (2d) 180939-U, ¶¶ 79-82. The state court, however, denied Petitioner's ineffective assistance claims as he could not show that counsel's deficiencies prejudiced his defense. *Id.* at ¶¶ 84-94.

Petitioner now brings his ineffective assistance of counsel claims before this Court in the instant habeas corpus petition. His arguments, however, fail to overcome the highly deferential standard for which this Court must apply when reviewing the state appellate court's adjudication of his ineffective assistance of counsel claims. Therefore, he is not entitled to habeas corpus relief. The Court denies his petition (Dkt. 2) on the merits, and declines to issue a certificate of appealability.

## I.    Background[1]

On September 17, 2011, Karlene Stilte, G.S.'s mother, dropped off G.S. and her three-year-old son, Graham, at her sister Kendra Chaplin's home. *People v. Reiss*, 2015 IL App (2d) 140488-U, ¶¶ 6-7, 11. Kendra shared the home with Petitioner (her fiancé) and their three-year-old son, Noah. *Id.* at ¶ 8. Kendra's children from a previous relationship, Andrew and Thomas, also lived with them. *Id.*

---

[1] The following facts are drawn from the state court record (Dkt. 10), and the decisions of the Appellate Court of Illinois on direct review and postconviction appeal. *See People v. Reiss*, 2015 IL App (2d) 180939-U; *People v. Reiss*, 2020 IL App (2d) 180939-U. The state court's factual findings are presumed correct unless Petitioner rebuts this presumption by clear and convincing evidence, *Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) (citing 28 U.S.C. § 2254(e)(1); *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018)), and Petitioner has not rebutted this presumption.

The plan that evening was for the adults to go out and celebrate Karlene and Kendra's birthdays, and for the children—G.S., Graham, Noah, Andrew, Thomas, and another cousin, Jack—to stay at Kendra's home and be watched by Jack's sixteen-year-old sister, Kayla.[2] *Id.* at ¶ 7. Petitioner had initially planned to join the adults for his fiancée's birthday celebrations but decided to stay home with the children instead. *Id.* The next morning, Karlene picked up G.S. and Graham from Kendra's home. *Id.* at ¶ 11. She found G.S. upstairs in one of the bedrooms with Andrew. *Id.* G.S.'s feet were in Andrew's mouth. *Id.* Karlene became angry and told Andrew that such conduct was inappropriate. *Id.* Downstairs, G.S. refused to hug Petitioner goodbye, but Karlene forced her to do so to avoid being rude. *Id.*

On the way home, Karlene talked to G.S. about inappropriate touches and asked what she would do if an adult inappropriately touched her. *Id.* at ¶ 12. G.S. became hysterical and began to cry. *Id.* She revealed that Petitioner had sucked on her feet, touched and licked her vagina, and licked her anus when the others were sleeping. *Id.* She repeated similar statements later that day to Dr. Linda Davis, an emergency physician at Good Shepherd Hospital, and the following day to Monique Heilemeier, a forensic interviewer at the Children's Advocacy Center (CAC). *Id.* at ¶¶ 12-13, 15, 27, 29-31. G.S.'s conversation with Dr. Davis was videorecorded by Karlene on her cellphone. *Id.* at 13. G.S.'s interview with Heilemeier was videorecorded pursuant to the CAC's protocols.[3] (Dkt. 10-13, p. 137.)

**A.     Petitioner's First Trial**

At a pretrial hearing, the trial court ruled that G.S.'s statements to Karlene, Dr. Davis, and Heilemeier about the sexual abuse were sufficiently reliable for admission at trial. *People v. Reiss,*

---

2 Kayla and Jack are the children of Karlene and Kendra's other sister, Kim. *Reiss,* 2015 IL App (2d) 140488-U, ¶ 7.

3 Both the Good Shepherd Hospital video and the CAC video are included in the record under seal. (Dkt. 22.)

2015 IL App (2d) 140488-U, ¶¶ 10-18. As part of that hearing, Karlene testified that, before the incident in question, G.S. had been diagnosed with Asperger's Syndrome by Dr. Nancy Keck, and had previously been treated for anxiety by Adrienne Ahlquist. (Dkt. 10-13, p. 113-14.)

At trial, the State called G.S., Karlene, Dr. Davis, Heilemeier, and Detective Daniel Hoffman of the Sycamore Police Department. *Reiss*, 2015 IL App (2d) 140488-U, ¶¶ 22-33. G.S. recounted the night that she spent at her aunt's house two years prior, and the way in which Petitioner fondled, licked, and digitally penetrated her sex organs. *Id.* at ¶ 23. Karlene, Dr. Davis, and Heilemeier testified regarding G.S.'s respective statements to each of them about the abuse. *Id.* at ¶¶ 25-32. The video of G.S.'s interview with Heilemeier was played for the jury, *id.* at ¶ 29, but the video of her interview with Dr. Davis was not. *Id.* at ¶ 18. The police detective testified that Petitioner denied having inappropriate contact with G.S., but admitted to nibbling on her fingers, blowing raspberries on her lower belly, and partially laying in the bed with her to rub lotion on her feet. *Id.* at ¶ 33.

For the defense, Petitioner recounted his version of events, denying sexual contact, and explaining that he only climbed into bed with G.S. and laid with her to watch a movie. *Id.* at ¶¶ 35-36. Andrew, Thomas, Jack, and Kendra were also called as defense witnesses. *Id.* at ¶¶ 40-43. The jurors deliberated and became deadlocked. *Id.* at ¶ 44. The trial court declared a mistrial. *Id.*

### B.    Petitioner's Second Trial

G.S. was 10 years old at the time of the second trial. (Dkt. 10-16, p. 8.) During her testimony, she recalled staying at her aunt's house with her cousins while her mom went out to celebrate her birthday with all the grownups except for Petitioner who stayed home. *Id.* at 10-11. When it was time for bed, she slept in one of the lofted beds in the boys' bedroom, and the boys slept in the other. *Id.* at 12-13. She testified that Petitioner got in the bed with her and licked and

4

rubbed her feet with his "wiener." *Id.* at 14-15. He also pulled her pants down, touched her on top of her "peeper"[4] with his hand, and touched and licked her "butt." *Id.* at 16-17. She denied digital penetration. *Id.* at 16. G.S. described Petitioner's conduct as "disgusting." *Id.* at 17.

G.S. testified that her mom came to pick her up the next morning. *Id.* at 18. She did not want to hug Petitioner goodbye, but her mom told her to do so. *Id.* She denied that Andrew was around when her mom came to pick her up. *Id.* at 21.

Karlene testified that when she went to pick up her children from her sister's house, she found G.S. upstairs with Andrew in the boys' bedroom. *Reiss*, 2015 IL App (2d) 140488-U, ¶ 52. Andrew was sucking on G.S.'s foot. *Id.* She scolded Andrew for the inappropriate behavior. (Dkt. 10-16, p. 37.) Downstairs, G.S. was reluctant to hug Petitioner good-bye. *Reiss*, 2015 IL App (2d) 140488-U, ¶ 52.

On the way home, Karlene had a conversation with G.S. about inappropriate touches. *Id.* Karlene testified that G.S. became upset and told her that Petitioner had climbed into bed with her and touched her feet, butt, and "peeper," and sucked her feet. *Id.* G.S. told Karlene that Petitioner touched her with his fingers and tongue, and that he also rubbed her feet on his penis. *Id.* Following G.S.'s outcry, Karlene picked up her husband from their home, and together they took G.S. to the hospital. (Dkt. 10-16, p. 41-42.)

Karlene explained that G.S.'s Asperger's Syndrome causes her difficulty communicating verbally, and that she often communicates by gesturing and spelling. (Dkt. 10-16, p. 43.) She further testified that following the incident, she observed changes in her daughter's behaviors, including that she was afraid of the dark and being left alone, that she would lock her door and barricade it with a chair at night, and that she withdrew from activities that she previously enjoyed.

---

4 G.S. used the term "peeper" to refer to her genital area. *Reiss*, 2015 IL App (2d) 140488-U, ¶ 13.

*Reiss*, 2015 IL App (2d) 140488-U, ¶ 52. She also observed changes in the frequency with which G.S. experienced anxiety, explaining that her daughter did not have anxiety before the event, but had severe anxiety afterwards. (Dkt. 10-16, p. 59.)

The trial court ruled that the cellphone recording of G.S.'s interview with Dr. Davis at the hospital was admissible, and the video was played for the jury. *Reiss*, 2015 IL App (2d) 140488-U, ¶¶ 48-50.

In the video,[5] Karlene cannot be seen, but it is apparent that she is holding the cellphone and recording G.S. and Dr. Davis. (Hospital Video, Pt. 1.) Dr. Davis asks G.S. what happened at her auntie's house that was a bad thing, and G.S. points to the camera and says, "you,"—seemingly telling Karlene to tell the doctor what happened. *Id.* at 0:35 – 0:46. G.S. appears shy in the video, and repeatedly tells or gestures to her mother to tell the doctor what happened. Karlene reassures her daughter that it will be okay and, at times, provides cues to help G.S. fill in the gaps for the doctor as to how Petitioner touched her.

In response to Dr. Davis' question, Karlene walks G.S. through her arrival at Kendra's house that morning, observation of Andrew sucking on her toes, and their conversation about inappropriate touches and what G.S. would do if an adult did that to her. *Id.* at 0:50 – 1:12. Karlene then asks G.S. about what she had told her in the car, to which G.S. spells out, "D-I-D" and "J-I-M." *Id.* at 1:13 – 1:42. (Petitioner's first name is Jimmy.) G.S. explains to Dr. Davis that a couple

---

5 When Petitioner filed his habeas corpus petition, he submitted a "redacted unofficial transcript of G.S. hospital video" in lieu of the video. (Dkt. 2-5.) Neither party submitted an official transcript of the video, nor does there appear to be one in the record. Rather, it seems the video itself was made part of the state court record, (Dkt. 10-13, p. 13), and the state appellate court on postconviction appeal explicitly stated that it viewed the video. *See Reiss*, 2020 IL App (2d) 180939-U, ¶ 87 (referencing the video of G.S.'s statement at the hospital and explaining "[w]e have watched that video …"). Petitioner has since filed the video of G.S.'s hospital interview under seal. (Dkt. 22.) The video was submitted as three different data files. For citation purposes, the Court refers to each respective data file as part 1, part 2, and part 3.

of people were sleeping in the bedroom, and that she was in the lofted bed all by herself. *Id.* at 2:23 – 2:45 She then sticks out her tongue. (Hospital Video, Pt. 2, 0:01 – 0:15.) Dr. Davis asks G.S. if Petitioner did something, and if he touched her, to which G.S. responds yes. *Id.* at 0:30 – 0:45. Using words and gestures, G.S. tells Dr. Davis that Petitioner touched her on her feet and in her private area. *Id.* at 0:57 – 1:41. She also shows Dr. Davis how Petitioner pulled her pants down to her ankles and, covering her face, explains that he touched her with his finger and his tongue. *Id.* at 4:30 – 5:15. Using her feet, G.S. mimics how Petitioner left the room and then returned to her lofted bed and pulled her pants down and did it all over again. *Id.* at 5:52 – 7:15. G.S. also points to her feet and, with Karlene's help, tells Dr. Davis that Petitioner put his toes in his mouth and rubbed his penis on her feet. *Id.* at 8:30 – 9:27.

Dr. Davis testified after the video was played and acknowledged that she did not have specific training in interviewing child victims of sexual assault. *Reiss*, 2015 IL App (2d) 140488-U, ¶ 50. She further testified that, based on the conduct that G.S. described, she was not surprised that her physical examination did not reveal anything unusual. (Dkt. 10-15, p. 522-23.)

Heilemeier testified regarding her interview with G.S. at the CAC the following day, and the recording of the video was played for the jury. *Reiss*, 2015 IL App (2d) 140488-U, ¶ 60. In the video,[6] G.S. identifies the individuals that live in her Aunt Kendra's household, including Andrew, Thomas, Noah, and a "big person," whom she identifies as Noah's father. (CAC Video, Pt. 1, 1:52:38-1:57:07.) Pointing to different parts of a drawing of a female body, and using Play-Doh,

---

6 Just like he did for the hospital video, Petitioner submitted an "unofficial transcript of G.S. CAC interview" with his habeas corpus petition. (Dkt. 2-6.) Neither party submitted an official transcript of the video, nor does there appear to be one in the record. Rather, the video itself was made part of the record and submitted to the state appellate court. (Dkt. 10-13, p. 14.) Petitioner has since filed the video of G.S.'s CAC interview under seal. (Dkt. 22.) The video was submitted as three different data files. For citation purposes, the Court refers to each respective data file as part 1, part 2, and part 3.

drawings, words, and gestures, G.S. describes how the "big person" touched her "butt" and "china"[7] with his hands and tongue both over and under her clothing. *Id.* at 1:57:39 – 2:00:03. G.S. explains that "it felt good, but it actually is kinda gross on the inside." *Id.* at 2:01:51 – 2:01:56. She tells Heilemeier that it happened every time she went to their house, beginning when she was five. *Id.* at 2:02:00 – 2:02:19.

When asked if anyone had asked her to touch them on their "weenie" or their "butt," G.S. again identifies "big." (CAC Video, Pt. 2, 2:12:58 – 2:13:20.) G.S. explains that the "big person" tried to make her touch him on his "W" with her feet both over and under his clothes the last time that she was there. *Id.* at 2:13:20 – 2:14:20. She writes out the word "rubbing" to describe how he did this. *Id.* at 2:15:57 – 2:16:35. She also states that the "big person" touched her "china" with his hands both with her pants on and with her pants off. *Id.* at 2:17:03 – 2:18:05. G.S. believed that he touched her both inside and outside her "china," describing it as feeling good, but weird, and that it hurt. *Id.* at 2:18:13 – 2:18:45. She explains that the last time it happened, she was sleeping in Thomas's lofted bed when the "big person" climbed up and started "doing it." *Id.* at 2:19:09 – 2:20:05. G.S. adds that he also used his tongue to touch her "china." *Id.* at 2:20:05 – 2:21:05. G.S. describes to Heilemeier that the "big person's" "W" was hairy, squishy, and sweaty, and that he called her beautiful. (CAC Video, Pt. 3, 2:42:43 – 2:45:05; 2:47:05 – 2:48:35.) G.S. explains that after "big" touched her "china" with his hands and her feet with his "W," he went to the bathroom, washed his hands, and then returned to the loft bed and did it all over again. *Id.* at 2:48:48 – 2:50:00.

As part of the interview, Heilemeier goes over G.S.'s statements with her, at which time she expresses uncertainty about whether all the conduct she described that "big" did started when she was five. (CAC Video, Pt. 2, at 2:28:48 – 2:29:01.) There are also times in the video where

---

[7] G.S. used the term "china" to refer to her genital area. *Reiss*, 2015 IL App (2d) 140488-U, ¶ 23.

G.S. describes instances involving Andrew or "the eleven-year-old," explaining that he would put his feet in her mouth or dare her to get undressed and kiss her on the mouth. (CAC Video, Pt. 1, 2:02:33 – 2:03:22; CAC Video, Pt. 2, 2:04:51 – 2:09:59.)

After the video was played for the jury, Heilemeier testified that some of the practices she used in her interview with G.S., such as allowing her to write words on easel paper and in Play-Doh, were not part of her standard practice, but were employed due to G.S.'s diagnoses that affected her ability to communicate. (Dkt. 10-16, p. 115-17.)

The State also called Elba Karim, who did not testify at the first trial. *Reiss*, 2020 IL App (2d) 180939-U, ¶ 24. Karim testified that she was licensed as a clinical professional counselor and certified as a trauma clinician. *Id.* at ¶¶ 24-25. She had a master's degree in human development and an "ABD" ("all-but-done") Ph.D. in marriage and family therapy.[8] *Id.* at ¶ 24. At the time of trial, Karim was a clinical director and therapist at StillWaters Behavioral Health. *Id.* at ¶ 25.

Karim stated that she had been qualified to testify as an expert on five prior occasions and had been qualified as an expert in "a number of different things," including child development, trauma, childhood trauma, parenting, attachment, child psychology, and child and family interactions. (Dkt. 10-16, p. 71.) She estimated that she had treated approximately 650 to 700 children in the field of child psychology and trauma. *Reiss*, 2020 IL App (2d) 180939-U, ¶ 25. The State tendered Karim as an expert in child psychology, and Petitioner's counsel asked whether she was being tendered "as an expert in child psychology generally." (Dkt. 10-16, p. 71.) The State clarified her expertise included a specialty in trauma, and the trial court determined Karim to be an "expert in the area of child psychology with an emphasis on trauma." *Id.* at 72.

---

8 Karim defined "ABD Ph.D." as meaning that she had completed all the coursework and testing associated with her Ph.D. but had not completed her dissertation. (Dkt. 10-16, p. 65.)

Karim explained that she treated G.S. from the fall of 2011 through April 2013. *Reiss*, 2015 IL App (2d) 140488-U, ¶ 57. She was aware that G.S. had previously been diagnosed with ADHD and Asperger's Syndrome, and described how these diagnoses affected her ability to think abstractly, read facial expressions, and understand metaphors. *Reiss*, 2020 IL App (2d) 180939-U, ¶ 26. Karim explained that G.S. exhibited symptoms of trauma, including "sleep disturbance, she had lots and lots of nightmares about the events that she told [Karim] about, and she also had some real fidgety kinds of behaviors, some facial tics, lots and lots of anxiety, lots of questions about how things were going to affect her life, including how court would affect her life." (Dkt. 10-16, p. 76-77.) Karim diagnosed G.S. with PTSD. *Reiss*, 2020 IL App (2d) 180939-U, ¶ 26.

Karim acknowledged that her practice group is on a referral list at the CAC and that G.S. had been referred to her. (Dkt. 10-16, p. 82, 88.) She also admitted that she had talked to an investigating officer about G.S.'s case. *Id.* at 82. Karim further acknowledged that G.S. was diagnosed with ADHD and Asperger's before the incident, and that she did not have a baseline of G.S.'s symptoms. *Id.* at 82-83. She explained, however, that she's "been working with kids with trauma for over 20 years, so [she is] pretty good at being able to see what different kinds of symptoms they have." *Id.* at 83.

Andrew, Thomas, and Kendra testified for the defense. *Reiss*, 2015 IL App (2d) 140488-U, ¶ 61. Andrew testified that Petitioner stayed home with the children that evening but did not provide further detail as to his whereabouts in the house. (Dkt. 10-16, p. 136-44.) He said that only he and Thomas slept in the bedroom with the lofted beds. *Id.* at 142. He did not recall seeing Karlene in the lofted bedroom the next morning, nor having a conversation with her. *Id.* at 143.

Thomas denied sleeping in the lofted bedroom. *Id.* at 153-54. He explained that Andrew and Jack slept in one of the lofted beds, and that G.S. slept in the other. *Id.* at 153-54, 160-61. He observed Petitioner in and out of the lofted bedroom a few different times that night. *Id.* at 159.

Kendra testified that Petitioner decided to stay home before he knew G.S. was staying over. *Reiss*, 2015 IL App (2d) 140488-U, ¶ 61. When she returned home that evening, she found Jack and Graham asleep together in one of the lofted beds. (Dkt. 10-16, p. 178.) Andrew and G.S. were awake and laying on the floor with G.S. on top of Andrew. *Id.* at 178-79. Kendra told G.S. to go to bed in the lofted bed and told Andrew to go to bed downstairs. *Id.* at l79. She returned to her bedroom where Petitioner and Noah were sleeping. *Id.* at 181. When Karlene arrived the next morning, Kendra followed her sister upstairs to the lofted bedroom and heard her have a conversation with Andrew and G.S. *Id.* at 184, 186-87. Kendra stated that G.S. hugged everyone goodbye when they left. *Id.* at 187.

Petitioner, Jack, and Detective Hoffman did not testify at the second trial. *Reiss*, 2020 IL App (2d) 180939-U, ¶ 87.

During closing argument, the State referred to Karim's testimony regarding G.S.'s diagnosis, specifically how Karim diagnosed G.S. with PTSD resulting from the trauma that she reported to her. (Dkt. 10-16, p. 257-28.) The State also referenced her testimony regarding G.S.'s abilities to think abstractly and communicate, asserting:

> You also heard from Elba Karim in her vast amount of experience, vast amount of experience, that this – the Asperger's specifically affected [G.S.'s] ability to communicate. She has difficulty with abstract concepts, and remembering events can be an abstract concept. Now, she hears questions, gives socially appropriate responses, but may not necessarily understand what she heard, so you have to confirm that she's understanding. It's not something you can necessarily do in court.

*Id.* at 257.

11

The jury found Petitioner guilty on all counts. *Reiss*, 2020 IL App (2d) 180939-U, ¶ 28.

## C.    Petitioner's Direct Appeal

Petitioner appealed his convictions, arguing: (1) that he received ineffective assistance of counsel for his trial attorney's failure to call Jack as a witness at the second trial; (2) that it was error to admit G.S.'s statements to Dr. Davis; and (3) that the State failed to prove him guilty beyond a reasonable doubt. (Dkt. 10-2, p. 1-50.) The state appellate court affirmed his convictions. *Reiss*, 2015 IL App (2d) 140488-U, ¶ 103.

Petitioner, through counsel, raised the first two issues in a petition for leave to appeal (PLA) to the state supreme court (Dkt. 10-5, p. 4-24.) The Supreme Court of Illinois denied his PLA. *People v. Reiss*, 48 N.E.3d 676 (Table) (Ill. 2016).

## D.    Petitioner's Postconviction Proceedings

Following the conclusion of his direct appeal, Petitioner sought postconviction relief. With the assistance of his present attorneys, he filed a postconviction petition which, relevant here, argued that his trial counsel was ineffective for failing to: (1) consult with and call an expert to challenge the reliability and validity of Karim's diagnosis; (2) subpoena G.S.'s prior treatment records; and (3) properly impeach and challenge the prosecution's case. (Dkt. 10-6, p. 15-26.)[9]

Petitioner attached to his postconviction petition a report by Dr. Christofer Cooper, a board-certified forensic psychologist. (Dkt. 10-8, p. 146-154; 243-246.) Petitioner had retained Dr.

---

[9] The other issue raised in Petitioner's postconviction petition was a claim of actual innocence based on an affidavit executed by Andrew in which he attests that his testimony at trial was not truthful in that he failed to testify that on the night that G.S. slept over, she laid on top of him with her back on his stomach, rubbing back and forth, and the following morning put her feet in his mouth. (Dkt. 10-6, p. 10-14) (postconviction petition); (Dkt. 10-8, p. 142-45.) The trial court granted the State's motion to dismiss as to this claim, (Dkt. 10-8, p. 247), and the state appellate court affirmed that dismissal on appeal. *Reiss*, 2020 IL App (2d) 180939-U, ¶¶ 71-73. Petitioner did not raise his actual innocence argument in his postconviction PLA, (Dkt. 10-12, p. 1-27), nor does he raise it in his habeas corpus petition. (Dkt. 2, p. 6-46.)

Cooper to provide consultation on Karim's expert testimony proffered at trial. *Id.* at 146. His report covered four areas: (1) Karim's PTSD diagnosis; (2) areas in which, based on Dr. Cooper's professional experience providing expert testimony, Karim could have been more effectively cross-examined; (3) G.S.'s prior health records; and (4) the ways in which consultation with a defense expert could have rebutted Karim's testimony. *Id.* at 147-50. His report was later supplemented to account for G.S.'s health records that Petitioner subpoenaed during postconviction proceedings. *Id.* at 243-46.

The trial court held an evidentiary hearing on Petitioner's ineffective assistance of counsel claims. *Reiss,* 2020 IL App (2d) 180939-U, ¶ 43. At the hearing, Petitioner called Ahlquist, a licensed clinical social worker, who testified that she saw G.S. "a total of two times" in February 2009 after she was referred by another doctor for symptoms of PTSD. (Dkt. 10-17, p. 26, 28-29.) Her records indicated that Karlene sought treatment for G.S. following a motor vehicle collision in December 2008. *Id.* at 27-28; *see also* (Dkt. 10-8, p. 217, 230.) Ahlquist testified that she was aware G.S. had ADHD, but she did not recall having knowledge that G.S. had previously been diagnosed with Asperger's Syndrome. (Dkt. 10-17, p. 29.) Ahlquist's knowledge of G.S.'s ADHD diagnosis did not affect her PTSD diagnosis. *Id.* at 30.

Petitioner also called Dr. Cooper as a witness. *Id.* at 32. He was qualified as an expert in forensic psychology and testified consistently with his reports. *Id.* at 43. As to Karim's credentials, Dr. Cooper conceded that Karim did not say she was a psychologist and there was no implication from her testimony that she was a psychologist. *Id.* at 58. He opined, however, that her credentials were misleadingly portrayed by tendering her as an expert in child psychology without objection or cross-examination from Petitioner's counsel that clarified for the jury that she was not trained or licensed as a psychologist, did not have a degree in psychology, that she would likely have to

13

restart a Ph.D. program if she wanted to complete her degree, and even if she did complete her Ph.D., her area of study would not make her eligible to be a psychologist. *Reiss*, 2020 IL App (2d) 180939-U, ¶¶ 46-47.

As to her treatment and diagnosis of G.S., Dr. Cooper opined that Karim was not qualified to "render a PTSD diagnosis as a psychologist." (Dkt. 10-17, p. 70.) He did not offer an opinion as to her ability to do so as a licensed therapist. Dr. Cooper testified that symptoms of ADHD and Asperger's Syndrome can also be associated with PTSD and opined that diagnosing G.S. with PTSD given her other diagnoses would have been "an extremely … complex clinical endeavor," even for a clinical psychologist. *Id.* at 70-75.

Dr. Cooper further testified that, based on his reading of Karim's notes, she appeared to have made an "initial diagnosis" of PTSD before meeting with G.S. *Id.* at 77-78; 92-96. Her notes also showed a four-month gap in treatment, which Dr. Cooper opined was "significant because there could be many intervening events." *Id.* at 82-83. Dr. Cooper also discussed that the Diagnostic and Statistical Manual of Mental Disorders (DSM) provides that symptoms must be present for at least six months before a diagnosis of PTSD can be made, and that the symptoms may abate over time with treatment. *Id.* at 78.

Regarding the prior records from Ahlquist, Dr. Cooper testified that, from his perspective, they had "incredible implications" because the records demonstrated: that G.S. experienced a traumatic event involving a motor vehicle collision in December 2008; that Ahlquist made a formal PTSD diagnosis; and that G.S. never completed the recommended treatment. *Id.* at 91, 96-97. Dr. Cooper opined that diagnosing G.S. with PTSD without knowledge of her prior diagnosis would be concerning because a later event could have caused her earlier symptoms to resurface. *Id.* at 96-97. He agreed, however, that PTSD symptoms are not necessarily tied to a single preceding event,

and that a person can experience PTSD following different events at various points in life. *Id.* at 124-26.

Finally, Dr. Cooper testified as to two other areas of concern—the first being that Karim was asked certain questions about Asperger's Syndrome at trial, even though she was not qualified as an expert in Asperger's and her notes indicated that she had told the prosecutor this. *Id.* at 98-99. It also concerned him that Karim's "dual relationship" as a treatment provider and an expert witness went unchallenged because a clinician is generally an advocate for their patient, whereas an expert provides an objective opinion. *Id.* at 99, 113-14.

Robert Nolan, Petitioner's trial counsel, was also called by Petitioner to testify at the hearing. *Reiss*, 2020 IL App (2d) 180939-U, ¶ 52. He admitted that he should have obtained G.S.'s prior treatment records but did not. *Id.* He also conceded that he had no strategic reason for not consulting with a psychologist once he became aware that the State might introduce evidence of G.S.'s mental state after the alleged abuse. *Id.* Nolan explained that he had always thought defending child sex cases was difficult and tried to avoid "dirtying up" the victim. *Id.* His trial strategy was to show that the State had insufficient evidence to prove its case. *Id.*

The State called Karim in rebuttal. *Id.* at ¶ 53. She testified that she has worked with children and families as a licensed professional clinical counselor in the area of trauma for the majority of her career. (Dkt. 10-17, p. 182-83.) As a licensed counselor, she is able to make mental health diagnoses, like PTSD. *Id.* at 183. Karim explained that the DSM provides the criteria for making PTSD diagnoses, and that therapist, social workers, and psychologists alike use it. *Id.* at 209-10. She also took coursework on diagnosing, had ongoing supervision, and took continuing education credits to hone her diagnostic skills. *Id.* at 213-14.

As to her diagnosis, Karim testified that G.S. told her she was sexually abused by Petitioner. *Id.* at 184. G.S. told Karim that the abuse happened every time she went to his house, beginning when she was around five years old. *Id.* at 185. She treated G.S. for a year and a half and her PTSD diagnosis did not change, though G.S.'s symptoms became less debilitating. *Id.* at 184. Karim explained that her diagnosis would not have changed had she known G.S. had previously been diagnosed with PTSD because she had all the symptoms of PTSD at the time of treatment, and there's a greater risk of PTSD upon multiple exposures to trauma. *Id.* at 182, 185.

Karim was heavily cross-examined on her notes from her sessions with G.S., particularly regarding where in her notes she documented that G.S. suffered from "lots and lots" of anxiety and nightmares, as she so testified at trial. *Id.* at 186-201. Though she acknowledged that her notes did not include such verbiage, they reflected that G.S. attempted to avoid talking about the sexual abuse, had ruminating and intrusive thoughts, particularly at nighttime, and was afraid of the dark out of fear of the abuse. *Id.* at 189-90, 218-20.

As to G.S.'s other diagnoses, Karim testified that she did not consider herself an expert in Asperger's or ADHD. *Id.* at 210-11. She did not believe that it was necessary to have expertise in these areas to differentiate between symptoms of Asperger's, ADHD, and PTSD because the DSM asks whether the symptoms of PTSD are present, not where they come from, and G.S.'s symptoms fit the PTSD criteria. *Id.* at 211. Regarding her role as G.S.'s therapist, Karim explained that she did not view her role as being an advocate for her patient; rather, she viewed her role as helping patients get better through treatment. *Id.* at 204. Additionally, she acknowledged having conversations with law enforcement about the case, and that G.S. and her mother asked her questions about the impact of trial and what would be expected of them. *Id.* at 206. She also spoke

with the prosecutor about asking G.S. clear, concrete questions because she was not good at understanding metaphors. *Id.* at 208.

The trial court denied postconviction relief, (Dkt. 10-17, p. 289-307), and Petitioner challenged that denial on appeal. (Dkt. 10-8, p. 31-60.) His appeal raised all of the ineffective assistance arguments that he presented in his postconviction petition with the exception of trial counsel's failure to call an expert witness at trial (contending only that trial counsel was deficient in failing to *consult* an expert). *Id.*; *see also Reiss*, 2020 IL App (2d) 180939-U, ¶ 75 n.1.

The state appellate court concluded that trial counsel's errors constituted constitutionally ineffective performance, *Reiss*, 2020 IL App (2d) 180939-U, ¶ 82, but that Petitioner could not establish the requisite prejudice for his ineffective assistance of counsel claims. *Id.* at ¶ 96. Accordingly, the state appellate court affirmed the denial of his postconviction petition. *Id.*

The Supreme Court of Illinois denied his subsequent postconviction PLA, (Dkt. 10-12, p. 1-26), which asserted the same ineffective assistance arguments raised on postconviction appeal. *People v. Reiss*, 163 N.E.3d 743 (Table) (Ill. 2021).

## II. Discussion

Petitioner now brings his ineffective assistance of trial counsel claims before this Court in a habeas corpus petition under § 2254. (Dkt. 2.) He contends that his trial counsel rendered constitutionally ineffective assistance where he failed to subpoena G.S.'s prior treatment records, consult with an expert, and challenge Karim's testimony through cross examination. *Id.* at 27-44.

Review of Petitioner's claims is governed by the Antiterrorism and Death Penalty Act ("AEDPA"). Under the AEDPA, a habeas corpus petitioner is entitled to relief under § 2254 only when the state court's decision on the merits of a given claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court,

or was based on an unreasonable determination of the facts." *Cook v. Foster*, 948 F.3d 896, 901 (7th Cir. 2020) (citing 28 U.S.C. § 2254(d)). By design, this is a "difficult to meet" and "highly deferential standard for evaluating state-court rulings" that "demands [] state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks omitted) (citing *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

A state court decision is "contrary to" clearly established federal law "if the state court 'applie[d] a rule different from the governing law set forth' in Supreme Court decisions or decided a case differently than the Supreme Court has 'on a set of materially indistinguishable facts.'" *Corral v. Foster*, 4 F.4th 576, 582 (7th Cir. 2021) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)). "A state court decision amounts to an unreasonable application of Supreme Court precedent when it applies that precedent in a manner that is 'objectively unreasonable, not merely wrong.'" *Meyers v. Gomez*, 50 F.4th 628, 641 (7th Cir. 2022) (citing *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014)). Similarly, a "challenge to a decision based on a factual determination will not succeed" unless the habeas petitioner "establish[es] that the state court committed unreasonable error." *Ward v. Sternes*, 334 F.3d 696, 703-04 (7th Cir. 2003). The state court's factual findings upon which its ruling rests are presumed correct unless the habeas petitioner rebuts that presumption by clear and convincing evidence. *Shannon v. Hepp*, 27 F.4th 1258, 1267–68 (7th Cir.), *cert. denied,* 143 S. Ct. 160 (2022) (citing § 2254(e)(1); *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

The applicable federal law in this case comes from *Strickland v. Washington*, 466 U.S. 668 (1984), wherein the Supreme Court established the standard for obtaining relief for ineffective assistance of counsel. To prevail on an ineffective assistance of counsel claim, Petitioner must

demonstrate: "(1) that trial counsel provided constitutionally-deficient performance, meaning counsel made errors so serious he was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment; and (2) that the deficient performance prejudiced his defense, meaning there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Dunn v. Neal*, 44 F.4th 696, 706-07 (7th Cir. 2022) (citing *Winfield v. Dorethy*, 956 F.3d 442, 451-52 (7th Cir. 2020) (quoting *Strickland*, 466 U.S. at 687, 694)) (internal quotation marks omitted). A reasonable probability is a probability "sufficient to undermine confidence in the outcome—that is, a reasonable probability that, absent the errors, at least one factfinder would have had a reasonable doubt respecting guilt." *Id.* at 709 (citing *Buck v. Davis*, 580 U.S. 100, 119 (2017); *Strickland*, 466 U.S. at 695; *Thomas v. Clements*, 789 F.3d 760, 773 (7th Cir. 2013)). Unless both showings are made, "it cannot be said that the conviction … resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687. The full course of counsel's representation is evaluated under *Strickland*. *Coleman v. Neal*, 990 F.3d 1054, 1056 (7th Cir. 2021).

The operative decision for this Court's review is the state appellate court's opinion on postconviction appeal, as that is the last state court to address Petitioner's ineffective assistance claims in a reasoned decision on the merits. *See Thurston v. Vanihel*, 39 F.4th 921, 928 (7th Cir. 2022). Because both *Strickland*'s standard for reviewing attorney effectiveness and § 2254(d)'s standard for reviewing state-court decisions are deferential, this Court's review of the state appellate court's decision is "'doubly' so." *Richter*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

A. ***Strickland***'s Performance Prong

As for *Strickland*'s performance prong, the state appellate court held that trial counsel's deficiencies in failing to subpoena G.S.'s prior health records, consult with an expert, and effectively cross-examine Karim fell below an objective standard of reasonableness. *Reiss*, 2020 IL App (2d) 180939-U, ¶¶ 79-82.

Neither party contests this adjudication, and rightfully so. The state court's decision was not contrary to *Strickland*, as the correct standard was cited and applied to Petitioner's ineffective assistance claims. *Reiss*, 2020 IL App (2d) 180939-U, ¶ 77 (explaining that Petitioner "must overcome the strong presumption that any challenged inaction may have been the product of sound trial strategy" and "show his counsel's performance was so inadequate that it fell below an objective standard of reasonableness"); *see also Strickland*, 466 U.S. at 689 ("the defendant must overcome the presumption that … the challenged action might be considered sound trial strategy") (internal quotation marks and citation omitted).

Additionally, the state court's conclusion that Petitioner made the requisite showing of deficient performance was reasonable. A defendant's "counsel has a duty to make reasonable investigations …" *Strickland*, 466 U.S. at 691. Though "a decision not to investigate and present expert testimony as a matter of trial tactics can fall within the range of reasonable performance[,]" "the decision must be—in fact—strategic" for this deference to apply. *Dunn*, 44 F.4th at 707 (internal quotation marks and citations omitted). "[C]onsequences of inattention rather than reasoned strategic decisions are not entitled to the presumption of reasonableness." *Id.* (internal quotation marks and citations omitted).

The state appellate court determined that trial counsel had knowledge of both the State's intention to call Karim as a witness to introduce evidence of G.S.'s mental state after the abuse,

and that G.S. had a history of mental health treatment, including prior treatment for anxiety and a prior Asperger's diagnosis. *Id.* at ¶ 79. Despite this knowledge, he did not conduct any investigation into G.S.'s health history or the significance of her prior diagnoses in relation to Karim's anticipated testimony. His inaction was attributable to inattention rather than a reasoned strategic judgment, and he acknowledged as much at the evidentiary hearing. (Dkt. 10-17, p. 160.) The failure to conduct a reasonable investigation into a key issue in the case is deficient performance. *Stitts v. Wilson*, 713 F.3d 887, 893-94 (7th Cir. 2013) (discussing numerous Supreme Court and Seventh Circuit cases finding deficient performance for failure to investigate central issues in a case).

Trial counsel made a similar concession as to his cross-examination of Karim, stating he had no strategic reason to account for the manner in which he conducted his cross-examination. *Id.* at 161. Karim's testimony was significant in that it showed G.S. suffered from trauma following the sexual abuse, thereby corroborating G.S.'s testimony. Had counsel fronted a stronger cross-examination as to Karim's credentials, her treatment notes, her PTSD diagnosis, and her dual role as an expert and G.S.'s therapist, it would have more effectively challenged her credibility and objectivity. The failure to do so rendered counsel's performance below an objective standard of reasonableness. *See e.g., Burns v. Hompe*, 339 F. App'x 624, 628 (7th Cir. 2009) (non-precedential opinion) ("Failure to cross-examine a crucial government witness can be a ground for finding ineffective assistance.").

It is thus clear that counsel's choices were not the result of tactical decision-making. He was aware that the State was calling Karim to introduce evidence of G.S.'s mental state after the abuse, (Dkt. 10-17, p. 156), but failed to reasonably investigate this theory and allowed Karim's

testimony to go largely unchallenged on cross-examination. It was thus reasonable for the state appellate court to conclude that Petitioner had established deficient performance under *Strickland*.

### B.    *Strickland's* Prejudice Prong

Deficient performance alone, though, does not entitle Petitioner to habeas corpus relief on his ineffective assistance of counsel claims. *See Gage v. Richardson*, 978 F.3d 522, 527 (7th Cir. 2020) (explaining the petitioner "is only entitled to habeas relief if he satisfies both of *Strickland's* prongs"). As discussed above, Petitioner must also show a reasonable probability that, but for counsel's deficiencies, the result of the proceeding would have been different.  *Dunn*, 44 F.4th at 706-07. The Court's review of the question occurs with an evaluation of the case as a whole, *Cook*, 948 F.3d at 901, and through the deferential lens of the AEDPA. § 2254(d). This is where Petitioner's claims failed on postconviction appeal, as the state appellate court held that Petitioner could not establish that counsel's deficient performance was prejudicial. *Reiss*, 2020 IL App (2d) 180939-U, ¶¶ 83-94. As discussed below, his claims fail here too.

### 1.    The State Appellate Court Did Not Act Contrary to *Strickland* in Rejecting Petitioner's Ineffective Assistance of Counsel Claims

According to Petitioner, his "overarching claim is that the appellate court unreasonably applied *Strickland* and reached a decision based on an unreasonable determination of the facts." (Dkt. 19, p. 4.) Despite this assertion, his petition raises "contrary to" arguments with respect to the state appellate court's articulation and application of *Strickland's* prejudice prong. He contends that the state appellate court incorrectly reformulated the prejudice inquiry to include a "preponderance of the evidence" standard, (Dkt. 2, p. 28), and that the state court applied a "solely outcome-determinative test." *Id.* at 28-29.

In its general overview of the standard for ineffective assistance of counsel claims, the state appellate court correctly recited *Strickland's* two-prong standard, including that, to establish the

requisite prejudice, Petitioner must show "there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different." *Reiss*, 2020 IL App 180939-U, ¶ 77. The state appellate court repeated this standard in the section of its opinion devoted to analyzing prejudice, again stating that Petitioner must "show[] there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Id.* at ¶ 84 (citing *Strickland*, 466 U.S. at 694). Additionally, the state court correctly defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* (citing *Strickland*, 466 U.S. at 694).

Despite multiple correct statements of the *Strickland* standard, in one sentence of its opinion, the state appellate court reformulated its articulation of *Strickland* prejudice, stating: "[Petitioner] must show by a preponderance of the evidence that there is a reasonable probability that he would have been acquitted but for the deficiencies in counsel's performance." *Id.* at ¶ 84.

Petitioner challenged this reformulation in his habeas petition, arguing that requiring him to show prejudice by a preponderance of the evidence is contrary to *Strickland*. (Dkt. 2, p. 28.) Respondent countered that this argument fails because the state court was not incorrectly paraphrasing *Strickland*'s prejudice prong; rather it was simply referencing Petitioner's burden of proof at a postconviction evidentiary hearing under Illinois' Postconviction Hearing Act. (Dkt. 9, p. 20-21.) Relying on *Holland v. Jackson*, 542 U.S. 649 (2004) (per curiam), Petitioner changes course and now agrees that he could not show that the appellate court acted contrary to *Strickland*. (Dkt. 19, p. 3.) Petitioner is the master of his case and the Court therefore "take[s] [him] at [his] word" that he no longer wishes to pursue this argument on habeas corpus review. *See Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1012 (7th Cir. 2021) (internal

quotation marks and citations omitted); *Myles v. United States*, 416 F.3d 551, 552 (7th Cir. 2005) ("Fomenting litigation is not part of the judicial function.").

Despite Petitioner's concession that *Holland* controls this issue, the Court sees *Holland* as distinguishable. In *Holland*, the Supreme Court rejected a prisoner's "contrary to" challenge on grounds that the state court required proof of prejudice by a preponderance of the evidence rather than by a reasonable probability. 542 U.S. at 654-55. But, in *Holland*, it was clear that the state court was referencing a preponderance of the evidence standard in relation to the prisoner's burden of proof in postconviction proceedings. *See id.* at 654 (quoting the state court's opinion) ("[i]n a postconviction proceeding, the defendant has the burden of proving his allegations by a preponderance of the evidence").

The same cannot be said for the state appellate court in Petitioner's case. True, Illinois law requires the defendant prove by "a preponderance of the evidence that he suffered a substantial deprivation of his constitutional right" at a postconviction evidentiary hearing. *People v. Anderson,* 2022 IL App (1st) 192571-U, ¶ 38*; see also People v. Stovall*, 264 N.E.2d 174, 176 (Ill. 1970). But the state appellate court did not explicitly identify the preponderance of evidence standard as being the requisite burden of proof in Illinois postconviction proceedings as did the state court in *Holland*. This Court thus hesitates to agree with Petitioner's assertion that the difference between his case and *Holland* is "slight" and does not "warrant further argument … that the court acted contrary to federal law." (Dkt. 19, p. 4.) Nevertheless, Petitioner has withdrawn his argument so that ends the consideration of the issue.

Moreover, had the argument not been withdraw, the Court would hold that the state court's decision was not contrary to *Strickland*'s prejudice prong. There is a "presumption that state courts know and follow the law," and § 2254(d) requires that "state-court decisions be given the benefit

of the doubt." *Woodford*, 537 U.S. at 24 (2002); *see also Olvera v. Gomez*, 2 F.4th 659, 670 (7th Cir. 2021). As explained above, the state appellate court repeatedly, and correctly, referenced the "reasonable probability of a different outcome" inquiry applicable to *Strickland*'s prejudice prong both in describing the relevant standard, *see Reiss*, 2020 IL App (2d) 180939-U, ¶¶ 77, 84, and in explaining the basis for its rejection of Petitioner's ineffective assistance claims. *Id.* at ¶¶ 88-89. Viewed as a whole, the state court's analysis is sufficient to assure the Court that, despite the one-time reference to "preponderance of the evidence" and "acquittal," the state court understood and applied the correct standard. *See e.g., Olvera*, 2 F.4th at 669-70 (holding the state appellate court's statement that "we cannot find this new evidence *would have resulted in an acquittal"* was not contrary to *Strickland* where, "[r]eading the state appellate court's opinion in its totality, … the appellate court applied the correct standard, even if in one part of its opinion it mistakenly articulated that standard") (emphasis in original). Accordingly, as Petitioner so concedes, the state appellate court's decision is not "contrary to" *Strickland*'s prejudice prong.

The Court reaches the same conclusion on Petitioner's argument that the state appellate court incorrectly applied an outcome-determinative test in denying his ineffective assistance claims. (Dkt. 2, p. 28-29.) Petitioner argues that he was convicted on the "materially false" evidence that G.S.'s anxiety emerged after the sexual abuse, and counsel's failure to obtain G.S.'s prior medical records to refute this contention rendered the trial "unreliable because of a breakdown in the adversarial process" for which he is entitled to relief. *Id.* at 29.

In support of his outcome-determinative argument, Petitioner cites *Lockhart v. Fretwell*, 506 U.S. 364 (1993). (Dkt. 2, p. 28.) In *Lockhart*, the Supreme Court stated that a *Strickland* "analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Id.* at 369. *Lockhart*,

however, did not "modif[y] or in some way supplant[ ] the rule set down in *Strickland*." *Williams v. Taylor*, 529 U.S. 362, 391 (2000). Rather, as the Supreme Court has explained, *Strickland* governs the prejudice inquiry in "virtually all ineffective-assistance-of-counsel claims[;]" *Lockhart*'s "overriding focus on fundamental fairness" affects the prejudice analysis only in limited circumstances "where it would be unjust to characterize the likelihood of a different outcome as legitimate 'prejudice,'" such as an ineffective assistance claim based on counsel's refusal to allow the defendant to commit perjury. *Williams*, 529 U.S. at 391-92 (citing *Nix v. Whiteside*, 475 U.S. 157, 175-76 (1986)). But where the ineffective assistance claim is grounded in the "depriv[ation] … of a substantive or procedural right to which the law entitles" the defendant, a "straightforward application" of *Strickland*'s prejudice prong applies. *Williams*, 529 U.S. at 393.

Petitioner's claims that counsel failed to reasonably investigate and effectively cross-examine Karim fall into this latter category. *See, e.g., Washington v. Smith*, 219 F.3d 620, 632-33 (7th Cir. 2000) (quoting *Williams*, 529 U.S. at 363) ("an adequate investigation is surely a 'right to which the law entitles [petitioner]'"). Thus, *Lockhart*'s added emphasis on fairness plays no role in Petitioner's case. Rather, a straightforward *Strickland* prejudice analysis was the appropriate standard. *See Washington*, 219 F.3d at 632-33 (holding state court analyzed petitioner's ineffective assistance claim based on an unreasonable investigation under the wrong standard where it applied the *Lockhart* principle, rather than asking whether petitioner had demonstrated a reasonable probability of a different outcome).

As explained above, the state appellate court understood and correctly applied *Strickland*'s prejudice prong in Petitioner's case. To the extent that Petitioner argues the state court should have

26

added a *Lockhart* layer, his contention is incorrect. Accordingly, this Court rejects the argument that the state appellate court incorrectly applied a "solely outcome-determinative test."

For all the reasons above, the state appellate court's decision was not "contrary to" *Strickland*.

### 2. The State Appellate Court's Decision Was Not Based On An Unreasonable Application of *Strickland*

Equally, the state appellate court's decision did not rest on an unreasonable application of *Strickland*. The bar for demonstrating an "unreasonable application" is a high one; the habeas petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Corral*, 4 F.4th at 583 (citing *Woods*, 575 U.S. at 316) (quoting *Richter*, 562 U.S. at 103)) (internal quotation marks omitted). "[S]o long as 'fairminded jurists could disagree' on the correctness" of the state court's determination that an ineffective assistance claim lacks merit, federal habeas relief is precluded. *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)).

#### a. Failure to Investigate

Petitioner's challenge to counsel's deficient investigation is two-fold—he contends both the failure to obtain G.S.'s prior medical records and use these records in consultation with an expert prejudiced his defense. Noting that his first trial resulted in a hung jury, Petitioner asserts that the "crucial difference" between his first and second trials was Karlene's testimony that G.S. did not suffer from anxiety before the abuse, and Karim's testimony that G.S. suffered from PTSD after the abuse. (Dkt. 2, p. 29.) A proper investigation, according to Petitioner, would have revealed evidence that could have "effectively neutralize[d]" the only evidence the State offered to

27

corroborate the abuse. *Id.*

As discussed above, counsel was aware that G.S. had received previous treatment for anxiety from Ahlquist. Ahlquist's records showed that she saw G.S. on two occasions for PTSD that, according to Karlene, stemmed from a 2008 car collision when G.S. was around 5 years old. (Dkt. 10-8, p. 217.) Thus, Petitioner's theory is that revelation of these records would have undermined Karim's subsequent PTSD diagnosis following the abuse. But, had counsel challenged Karim's diagnosis using these prior records, it could have opened the door to the damaging evidence that G.S. disclosed to Karim that Petitioner's abuse began when she was five years old. (Dkt. 10-17, p. 109) ("[t]his happened every time I go over to his house, probably since I was five … [a]nd so I was always scared of him").[10]

As the state appellate court reasonably noted, it would have been very damaging to Petitioner's case to hear that G.S. made this allegation both to Heilemeier during their interview at the CAC and to Karim during their therapy sessions. *Reiss*, 2020 IL App (2d) 180939-U, ¶ 88. Thus, in considering the contents of G.S.'s prior medical records and the negative effect their introduction could have had on Petitioner's case, it was reasonable for the state appellate court to conclude that he could not show a reasonable probability of a different trial outcome. *Id.*

**b. Challenging Karim's Testimony and the State's Case**

Petitioner further challenges counsel on his deficient cross-examination of Karim. He points to several areas in which counsel could have more rigorously challenged the State's expert, including her qualifications, credentials, treatment notes, and diagnosis, and argues there is a

---

10 Neither party submitted Karim's notes as part of the state court record. The State, however, quoted G.S.'s prior abuse allegation from Karim's notes at the postconviction evidentiary hearing during the cross-examination of Dr. Cooper, and Petitioner did not object to the State's recitation. (Dkt. 10-17, p. 108-09.)

reasonable probability of a different trial outcome had these weaknesses been exposed. (Dkt. 2, p. 30-31.)

On postconviction appeal, the state court highlighted each of the challenged areas of cross-examination raised by Petitioner, including:

> [Karim's] education and credentials; her lack of expertise in Asperger's syndrome and child psychology; her lack of objectivity as G.S.'s therapist; her premature diagnosis of G.S. with PTSD; her pre-trial communication with the prosecution, including her advice to the prosecution about how to examine G.S. at trial and asking the prosecution to give her a list of questions in anticipation of trial; the fact that G.S.'s mother asked Karim how she should testify at trial; her lack of qualification to differentiate between Asperger's syndrome, ADHD and PTSD; that G.S. would be difficult to diagnose with PTSD given her complicated mental health history; that her notes did not support her testimony that G.S. suffered from "lots and lots" of anxiety and nightmares; that G.S. went four months without any treatment shortly after the alleged abuse; and that Karim did not obtain Ahlquist's notes before trial and therefore learn that G.S. had previously been diagnosed with PTSD.

*Reiss*, 2020 IL App (2d) 180939-U, ¶ 81. In considering whether Petitioner was prejudiced by these deficiencies, the state appellate court looked to "the particular facts introduced at [ ] trial, as well as those adduced at the [postconviction evidentiary] hearing," *id.* at ¶ 86, and held that Petitioner had not established the requisite prejudice. *Id.* at ¶¶ 89-94.

With respect to the multiple cross-examination deficiencies raised by Petitioner, he argues that the state appellate court failed to rule on the merits of his claim that counsel was ineffective for failing to object to Karim's testimony as it related to Asperger's Syndrome, and he is therefore entitled to *de novo* review of this issue. (Dkt. 2, p. 44-45.)

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99. The Supreme Court has explained that the *Richter* presumption applies also in cases where "a state-court opinion addresses some but not all of a defendant's claims." *Johnson v. Williams*, 568 U.S.

289, 298 (2013). *Richter* and *Williams* stand for the proposition that "the 'state courts must be given the benefit of the doubt when their opinions do not cover every topic raised by the *habeas corpus* petitioner.'" *Lee v. Avila*, 871 F.3d 565, 572 (7th Cir. 2017) (quoting *Brady v. Pfister*, 711 F.3d 818, 826 (7th Cir. 2013)). Only "[w]hen [the] evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court," does "§ 2254(d) entitle[] the prisoner to an unencumbered opportunity to make his case before a federal judge." *Williams*, 568 U.S. at 303.

Petitioner fails to show "very clearly" that his claim about counsel's failure to limit Karim's testimony as to Asperger's Syndrome was overlooked. Although the state court only explicitly referenced this issue in its analysis regarding counsel's performance, *Reiss*, 2020 IL App (2d) 180939-U, ¶ 81, it is clear that the state court carried over all of the deficiencies previously considered in the performance analysis to the prejudice analysis. *See id.* at ¶ 91 ("we now consider whether, but for the various deficiencies in cross-examining Karim, there was a realistic probability that the result at trial would have been different"). Petitioner provides nothing to the contrary that would overcome the presumption that the state court considered and denied all of these "various [cross-examination] deficiencies," including the one involving the failure to object to Karim's testimony regarding Asperger's. Accordingly, AEDPA's deferential standard of review applies.

As to the claim itself, the state appellate court's implicit rejection of Petitioner's argument was not unreasonable. G.S.'s Asperger's Syndrome and the way in which it affected her ability to communicate was a recurring theme throughout trial. Karlene testified that Asperger's affected G.S.'s ability to make eye contact and communicate verbally, resulting in her choosing to communicate in other ways, such as gesturing and spelling. (Dkt. 10-16, p. 43.) Heilemeier

testified that G.S.'s diagnosis affected the way in which she conducted her interview, explaining that she typically does not meet with parents beforehand, nor allows children to communicate via Play-Doh, but she did so for G.S. *See id.* at 101 ("It's not my standard practice, but in this particular case, the mother was very concerned about us interviewing the child and wanted … to make sure that I understood what her child's issues were as far as her developmental disabilities and things"); *see also id.* at 116-17 ("I don't normally have children write words in Play-Doh. Usually I have them tell me in their own language what they need to say, but because she did get fixated on certain words or she had trouble with certain words, discomfort, hypersensitivity to certain words, I did allow her some room in that respect…"). Further, the jury was able to observe G.S.'s difficulties with communication in the hospital and CAC videos.

The Court recognizes that, unlike Karlene and Heilemeier, Karim testified as an expert. But her expert testimony focused on the symptoms of trauma that the observed when working with G.S. Her discussion of Asperger's Syndrome was limited and related to her experience treating children with differential diagnoses and the symptoms that G.S. exhibited during her treatment. *Id.* at 75-76. And though the State referenced Karim's testimony as to G.S.'s Asperger's symptoms in closing argument, the argument was not tied to Karim's "expertise." Rather it was a continuation of the State's argument that G.S.'s Asperger's Syndrome affected her communication style which, in turn, impacted her testimony. *See e.g.,* (Dkt. 10-16, p. 256) ("G.S. needed assistance with communicating through other media, including spelling words out with Play-Doh, … and you saw [ ] gesturing in the video with Dr. Davis, and none of those options were available to her in court.")

It was therefore reasonable for the state appellate court to reject Petitioner's argument, as he cannot show a reasonable probability that the outcome of the trial would have been different had Petitioner's counsel succeeded in limiting Karim's testimony on this topic.

As for the other cross-examination deficiencies, Petitioner claims that the state appellate court misapprehended its role in analyzing *Strickland* prejudice by considering only Karim's defense of her testimony (not the evidence as a whole), and unreasonably applied the principle that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." (Dkt. 2, p. 29) (citing *Strickland*, 466 U.S. at 696.) He contends that "[t]he fact that [his] first trial resulted in a hung jury demonstrates that the evidence was, at most, closely balanced if not weak." (Dkt. 19, p. 21) (collecting non-binding authority from the Third, Sixth, and Ninth Circuits). Because there was no physical evidence or third-party eyewitnesses, Petitioner attributes the difference in outcome to Karim's largely unchallenged testimony, as that was "the only evidence … offered to substantiate G.S.'s allegations." (Dkt. 2, p. 29.)

In assessing the prejudice resulting from counsel's errors, *Strickland* requires the court consider "the totality of the evidence before the … jury," including the overall strengths or weaknesses of the State's case. *Strickland*, 466 U.S. at 695; *Sussman v. Jenkins*, 636 F.3d 329, 360 (7th Cir. 2011). Consequently, as Petitioner points out, "a verdict or conclusion that is overwhelmingly supported by the record is less likely to have been affected by errors than one that is only weakly supported by the record." *Hough v. Anderson*, 272 F.3d 878, 891 (7th Cir. 2001) (citing *Strickland*, 466 U.S. at 696).

Contrary to Petitioner's argument, however, the record before the Court does not support the assertion that the state appellate court mishandled the totality-of-the-evidence principle. As mentioned above, the state appellate court considered Petitioner's ineffective assistance claims in light of "the particular facts introduced at [ ] trial, as well as those adduced at the [postconviction evidentiary] hearing." *Reiss*, 2020 IL App (2d) 180939-U, ¶ 86. In doing so, the state appellate

court declined to draw any inferences from the fact that Petitioner's first trial resulted in a hung jury. *Id.* at ¶ 85 ("we note that a deadlocked jury in a previous trial is not a determinative factor in deciding the closeness of the evidence."). This was not unreasonable. *See Allen v. Chandler*, 555 F.3d 596, 603 (7th Cir. 2009) ("Each trial is a distinct event with many nuances that transcripts can never fully capture; we refuse to draw any conclusions based on the mere fact that two different events produced two different results.).[11] Further, as noted by the state appellate court, there were several differences in the two trials beyond Karim's testimony—Detective Hoffman, Jack, and Petitioner testified at the first trial, but not at the second; and the hospital video was played at the second trial, but not at the first. *Reiss*, 2020 IL App (2d) 180939-U, ¶ 87. The Court therefore declines to fault the state appellate court based on the difference in outcome between that of the first and second trials.

Rather, it is evident that the state appellate court acted consistent with its assertion that it "must assess how [counsel's] errors fit into the big picture of what happened at trial." *Reiss*, 2020 IL App (2d) 180939-U, ¶ 84; *see also Cook*, 948 F.3d at 901 (explaining that *Strickland* prejudice is "assess[ed] by evaluating the trial as a whole, not one slip at a time").

First and foremost, the state appellate court noted that G.S. herself testified about being sexually abused by Petitioner. *Id* at ¶ 90. Despite her young age, she was able to describe, even with her communication difficulties, how Petitioner rubbed her feet against his "wiener," touched her private parts, and licked her "butt" and feet, calling his conduct "disgusting."

---

11 Petitioner argues that reliance on *Chandler* is misplaced because the case "stands for the proposition that a mistrial alone will not invariably show that an error was 'outcome-determinative' when the evidence is otherwise overwhelming. (Dkt. 19, p. 21-22.) The Court does not view *Chandler* as applying only to cases where the evidence is overwhelming, as Petitioner seems to contend. Rather, *Chandler* demonstrates that a prior mistrial may be a consideration in the court's assessment, but it is not a conclusive factor of *Strickland* prejudice, which is the approach the state appellate court took in Petitioner's case.

In addition to G.S.'s testimony, the jury was able to hear and view, via the hospital and CAC videos, three separate disclosures of the abuse that G.S. made shortly after the incident. Karlene testified as to G.S.'s initial outcry in which her daughter explained to her that Petitioner touched her "peeper" and "butt" with his fingers and tongue, rubbed her foot with his penis, and sucked on her feet. G.S. restated the same allegations to Dr. Davis at the hospital, communicating through words, gestures, and actions how Petitioner touched her vagina and anus with his fingers and tongue, put her toes in his mouth, and rubbed his penis on her feet. And G.S. repeated these allegations for a third time to Heilemeier at the CAC, again describing the oral stimulation, digital penetration, and the rubbing of his penis on her feet that Petitioner perpetrated against her.

Although Petitioner seeks to characterize G.S.'s statements as contradictory and inconsistent, the most important aspects of her disclosure—the conduct perpetrated by Petitioner—remained substantially the same from her initial outcry through trial. At all times, G.S. maintained that Petitioner touched her private areas and feet with his fingers, tongue, and penis. Further, G.S.'s statements were readily challenged throughout trial by Petitioner's counsel, who argued that none of the disclosures were reliable as they were tainted by her mother, Karlene. *See* (Dkt. 10-16, p. 235-36.) Whether to credit G.S.'s statements rested soundly with the jury. *See, e.g., Romero-Gutierrez v. Nicklaus*, No. 19 CV 5195, 2021 WL 4146901, at *5 (N.D. Ill. Sept. 13, 2021) (emphasizing that it was for the jury to determine whether to credit child victim's testimony and statements made during Children's Advocacy Center interview).

Karim, on the other hand, did not disclose any statements made to her by G.S. regarding the sexual abuse. Rather, she testified regarding the trauma that G.S. experienced following the incident. The Court acknowledges that her testimony was not inconsequential. It corroborated G.S.'s allegations of sexual abuse. But challenging Karim's PTSD diagnosis on the basis of her

34

credentials or on grounds that G.S. had been treated for anxiety and PTSD in the past would not have directly undermined the disclosures of abuse that G.S. made not once, not twice, but three separate times before testifying in a substantially consistent manner at trial. *See, e.g., Hoglund v. Neal*, 959 F.3d 819, 837 (7th Cir. 2020) ("A jury may convict on the basis of the alleged child victim's testimony alone.").

This Court therefore cannot say that it was "beyond the realm of fair-minded disagreement" for the state appellate court to conclude that counsel's deficiencies with respect to his investigation and cross-examination of Karim was not prejudicial. *Shannon v. Hepp*, 27 F.4th 1258, 1267 (7th Cir. 2022) (citations omitted). Accordingly, the state appellate court's rejection of Petitioner's ineffective assistance claims was not based on an unreasonable application of *Strickland*. § 2254(d)(1).

### 3. The State Appellate Court's Finding of No *Strickland* Prejudice Was Not Based on an Unreasonable Determination of Facts

Finally, Petitioner argues that the state appellate court's rejection of his ineffective assistance of trial counsel arguments rests on various unreasonable determinations of fact, including: (1) the significance of the hospital video; (2) the use of G.S.'s prior abuse allegation; (3) the conclusions as to Karim's credentials; (4) the treatment of Karim's notes regarding G.S.'s nightmares and anxiety; and (5) the consistency of Karim's diagnosis in light of G.S.'s prior PTSD diagnosis. (Dkt. 2, p. 31-44.) This Court does not agree.

The AEDPA has two provisions that govern a federal habeas court's review of a state court's factual findings. *See* §§ 2254(d)(2), (e)(1). As explained above, § 2254(d)(2) "provides that a reviewing court should consider whether the factfinding 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,' whereas § 2254(e)(1) says that 'a determination of a factual issue made by a State court shall be presumed

to be correct'" unless the petitioner "'rebut[s] the presumption of correctness by clear and convincing evidence.'" *Thurston*, 39 F.4th at 929 n.2. As Petitioner indicates, the Supreme Court has "not defined the precise relationship" between these two provisions. *Burt v. Titlow*, 571 U.S. 12, 18 (2013). The Seventh Circuit, however, has repeatedly held that "'§ 2254(e)(1) provides the mechanism for proving unreasonableness [under § 2254(d)(2)].'" *Thurston*, 39 F.4th at 929 n.2 (quoting *Ben-Yisrayl v. Buss*, 540 F.3d 542, 549 (7th Cir. 2008)) (alteration in original).

An unreasonable determination of fact within the meaning of § 2254(d)(2) means the state court decision "rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018) (quoting *Newman v. Harrington*, 726 F.3d 921, 928 (7th Cir. 2013)) (internal quotation marks omitted). A state-court's factual determinations are not unreasonable "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood*, 558 U.S. at, 301. "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, … 'that does not suffice to supersede the trial court's … determination'" on federal habeas corpus review. *Id.* (quoting *Rice v. Collins*, 546 U.S. 333, 341-42 (2006)). Rather, "[a] state court decision that rests upon a determination of fact that lies against the clear weight of the evidence is, by definition, a decision 'so inadequately supported by the record' as to be arbitrary and therefore objectively unreasonable.'" *Morgan v. Hardy*, 662 F.3d 790, 798 (7th Cir. 2011) (citing *Ward*, 334 F.3d at 703-04 (quoting *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997)).

Petitioner cannot surpass this stringent standard.

### a.  Good Shepherd Hospital Video

Petitioner first argues that it was unreasonable for the state appellate court to "find that the second jury could have found" the video of G.S.'s statements to Dr. Davis at the hospital "not only

reliable, but powerfully corroborative of G.S.'s other statements." (Dkt. 2, p. 32) (quoting *Reiss*, 2020 IL App (2d) 180939-U, ¶ 87). He contends that the video is fraught with leading and suggestive questions that diminishes the reliability of G.S.'s statements, and that the state appellate court's failure to acknowledge these shortcomings constitutes an unreasonable determination of fact. (Dkt. 19, p. 23-24.) According to Petitioner, the result of the first trial, during which the jury heard Dr. Davis testify regarding G.S.'s statements, shows that it was unreasonable for the state appellate court to find that the video representation of these same statements both corroborative and reliable. (Dkt. 2, p. 32.)

The Court has viewed the hospital video and concludes that Petitioner's argument is nothing more than an alternative interpretation of the evidence. It is clear from the video that G.S. was uncomfortable with the questions being asked of her. *See* (Hospital Video, Pts. 1-2.) She oftentimes fidgets, turns her body away from the doctor, and covers her face. Dr. Davis and Karlene repeatedly attempt to reassure G.S. and emphasize to her the importance of telling the story of Petitioner's conduct in her own words. And G.S. eventually does so, by using her words, pointing to different parts of the body, confirming or denying certain conduct, and mimicking Petitioner's actions, such as the way in which he walked in and out of the bedroom, climbed up the ladder to the lofted bed, pulled down her pants, and used his tongue to lick her body parts.

True, the video is not void of certain questioning flaws. But this was not a forensic interview. The jury was aware that this discussion between G.S. and Dr. Davis was taking place in the context of a medical examination. Dr. Davis testified that she had no specific training with respect to interviewing child sex victims, nor did she follow any specific protocols with respect to her questioning other than those appropriate for the hospital setting. (Dkt. 10-15, p. 523-24.) As Dr. Davis explained, "I did the protocols appropriate with our protocols in the hospital, and then

the patient was sent on for further interviewing later." *Id.* at 524. And in this subsequent interview with Heilemeier, a forensic interviewer specifically trained in conducting noncoercive interviews with children, (Dkt. 10-16, p. 91), G.S. repeated, in a substantially similar manner, the same acts of sexual abuse that she had reported to Dr. Davis.

Other than transcribing the contents of the video and comparing the result of the first jury to that of the second, Petitioner offers no clear and convincing evidence that it was unreasonable for the state appellate court to credit the hospital video. The video afforded the jury the opportunity to observe G.S.'s demeanor and hear her description of Petitioner's conduct shortly after having spent the night at her aunt's house. In light of the depiction of G.S. in the hospital video, and in conjunction with her other statements to Karlene, to Heilemeier, and to the jury, it was not objectively unreasonable for the state appellate court to find that the jury could have found it "reliable" and "powerfully corroborative."

**b.    The Prior Abuse Allegation**

Next, Petitioner argues that the state appellate court's determination that he could not establish *Strickland* prejudice was based on the unreasonable finding that a more vigorous attack on Karim's testimony based on G.S.'s prior medical records may have opened the door to evidence that G.S. told Karim that Petitioner's abuse began when she was five years old. (Dkt. 2, p. 37-41.) He contends that it was unreasonable for the state appellate court to rely upon the prior abuse allegation where it was without evidentiary support, contradicted the State's theory of the case, and was rebutted by Kendra's testimony that G.S. had never been left alone with Petitioner before the charged conduct. *Id.*

Petitioner's argument is unavailing. First, there was support for the prior abuse allegation in that G.S. told Heilemeier that the abuse began beginning when she was five years old, (CAC

Video, Pt. 1, 2:02:00 – 2:02:19), and repeated a similar allegation to Karim during their therapy sessions. (Dkt. 10-17, p. 109) ("[t]his happened every time I go over to his house, probably since I was five … [a]nd so I was always scared of him"). And though Petitioner contends that G.S.'s testimony at the first trial that the abuse "only happened that night" contradicts any allegation that Petitioner abused G.S. before the 2011 incident, he conveniently leaves out the remainder of G.S.'s testimony on this point: "It only happened that night. He normally just did the wiener with the feet." (Dkt. 10-14, p. 280-81.) Further, the theory of the State's case was that Petitioner sexually abused G.S. Eliciting testimony from Karim that G.S. disclosed to her that Petitioner's abuse began when she was five would have helped, rather than harmed, this theory. Finally, G.S. and Petitioner were not by themselves when the charged conduct occurred; thus, it cannot be said that Kendra's testimony to this effect rebuts G.S.'s allegation of prior abuse.

Accordingly, the Court does not find that the state appellate court's consideration of the prior abuse allegation was unreasonable in rejecting Petitioner's ineffective assistance claims.

### c. Karim's Qualifications, Notes, Diagnosis, and "Dual Role"

Finally, Petitioner challenges several factual determinations that the state court made with respect to Karim's qualifications, notes, and diagnosis. Beginning first with her credentials, he argues it was unreasonable for the state appellate court to both conclude that Karim's testimony did not compound the fact that she was presented as an expert in the field of child psychology when she did not hold the proper licensure, and to find that she was just as qualified to make a PTSD diagnosis. (Dkt. 2, p. 41-42.)

As to Karim's qualifications, the record demonstrates that the foundation for her expert testimony derived from her experience in working as a therapist in the field of childhood trauma. She testified that she is licensed only as a "clinical professional counselor," and never represented

that she held any additional licensures. (Dkt. 10-16, p. 65.) Further, in almost all of her professional work experiences, she worked with children in the area of trauma. *Id.* at 66-68. She opened her own consulting business that helped school districts address childhood trauma in the classroom. *Id.* at 68. After that, she worked at StillWaters Behavioral Health where she treated G.S., which she described as a "trauma treatment group" that provides "therapy for children and adults," focused "specifically on trauma issues," such as "sexual abuse, people who have witnessed murder or had murder attempted on them, all different kinds of trauma." *Id.* at 68. She further testified that the "nature of [her] current practice" is "[t]rauma," that she is certified as a "trauma clinician," that she is trained in forensic interviewing and conducts trainings that teach investigators and other forensic interviewers how to be "more sensitive to children's needs who have gone through trauma," and that she has been working with "kids with trauma for over 20 years." *Id.* at 69, 70, 83, 86.

The only mention of "psychology" during Karim's testimony was her statement that she had been qualified as an expert on five prior occasions in the areas of "child development, trauma, childhood trauma, parenting, attachment, child *psychology*, [and] child and family interactions," and that she had treated roughly 650 to 700 children "in the field of child *psychology* and trauma." *Id.* at 70-71 (emphasis added). Other than these two instances, Karim's testimony as to her credentials focused on her expertise in trauma which, in turn, coincided with the substance of her testimony. She testified to the symptoms that she has observed in "children who have suffered from trauma in [her] professional experience," *id.* at 72-73, as well as the symptoms of trauma that she observed during her treatment of G.S., which led to her diagnosis of PTSD. *Id.* at 76, 77.

In Illinois, "[t]he indicia of expertise are not measured by a given level of academic qualifications, but by whether the proposed expert has [specialized] knowledge[,]" whether

40

through education, training, experience, or a combination of each, "beyond the average citizen that would assist the jury in evaluating the evidence." *People v. Atherton*, 940 N.E.2d 775, 791 (Ill. App. Ct. 2010). Here, the record is clear that Karim had the requisite knowledge to testify as an expert in the field of childhood trauma, which is what she did. That the State offered Karim as an expert in childhood trauma under the general umbrella of child psychology was, as the state appellate court noted, probably error. *See* (Dkt. 10-16, p. 72) (qualifying Karim as an expert in the area of childhood psychology with an emphasis on trauma). But, given that Karim's testimony focused almost exclusively on trauma, in which she described her qualifications and professional experiences as they related to trauma, it was reasonable for the state appellate court to find that Karim's testimony did not otherwise compound this error as the record makes clear that Karim was called to testify as an expert regarding childhood trauma.

Likewise, the Court rejects Petitioner's argument that it was unreasonable for the state appellate court to find that Karim was qualified to diagnose PTSD. There was no dispute that her licensure allowed her to make a PTSD diagnosis, and she testified at the postconviction evidentiary hearing that she did so using the same criteria from the DSM that other mental health professionals, like social workers (e.g., Ahlquist) and psychologists (e.g., Dr. Cooper), would use. (Dkt. 10-17, p. 182-83, 209-210.) Relying on Dr. Cooper's testimony, Petitioner appears to argue that simply applying the DSM criteria for PTSD in G.S.'s case would have been insufficient due to her other diagnoses of Asperger's Syndrome and ADHD. But Karim testified that she had experience treating children for trauma who, like G.S., had differential diagnoses. (Dkt. 10-16, p. 74.) And, in any event, it was pointed out to the jury that she rendered G.S.'s PTSD diagnosis without having any baseline as to her Asperger's and ADHD symptoms. *Id.* at 82-83. It was therefore reasonable for the state appellate court to credit Karim's qualifications and ability to diagnose and, in doing

so, reject the argument that there was a reasonable probability that a more rigorous cross-examination on these points would have altered the outcome of trial.

Petitioner next challenges the state court's factual determination that it was clear G.S. "suffer[ed] significantly" from "lots and lots" of anxiety and nightmares albeit that Karim did not use that precise wording in her treatment notes. (Dkt. 2, p. 43-44.) In reaching this conclusion, the state appellate court did not ignore the clear and convincing weight of the evidence.

As Karim explained at the postconviction evidentiary hearing, she typically provided less detail when charting after the initial disclosure, explaining "[w]hen it's the initial outcry, there's a fair amount of description [in her notes] usually in quotations for what the child is saying, less so in subsequent sessions." (Dkt. 10-17, p. 224-25.) Nevertheless, her testimony at the evidentiary hearing demonstrated that her notes, though often not using the specific words "anxiety" and "nightmares," frequently described symptoms of these issues that G.S. experienced throughout the treatment period.

For example, in some of the notes that Karim testified to, she described how G.S. suffered from recurring and intrusive thoughts regarding the abuse, *id.* at 194, 219-20; difficulty falling asleep and intruding thoughts at bedtime, *id.* at 219; and clenching in jaw and neck. *Id.* at 220. As Karim explained, anxiety has "many, many symptoms," *id.* at 193, and although she may not have specifically used the word "anxiety," to describe G.S.'s anxiety levels, it was clear she associated these other symptoms as a manifestation of G.S.'s anxiety. *See e.g., id.* at 189 ("Q: Is there a reference to anxiety in that note? A: Not directly to anxiety but to attempts not to think about the event."); *id.* at 190 ("Q: So again, no reference there in that note to any ongoing anxiety; correct? A: Not using the word 'anxiety.' … But she talks about intrusive thoughts."); *id.* at 219 (Q: Are those indicators of anxiety to you? A: It could be anxiety and/or PTSD.").

42

The same is true for Karim's assessment of G.S.'s nightmares. Karim's testimony reflected that G.S. had nightmares about the abuse, *id.* at 218-20; difficulty falling asleep, *id.* at 219; intruding thoughts at bedtime, *id.*; fear of the dark related to fear of abuse, *id.*; and difficulty sleeping alone. *Id.* at 220. These nightmares and sleeping-related issues were consistently mentioned in Karim's notes between August 2012 and February 2013. *Id.* at 218-20.

This Court does not find that the state appellate court's rejection of Petitioner's argument concerning Karim's testimony that G.S. suffered from "lots and lots" of anxiety and nightmares was "so inadequately supported by the record" as to be objectively unreasonable. *Morgan*, 662 F.3d at 798 (internal quotation marks and citation omitted). Karim clearly indicated in her notes that G.S. presented with these symptoms at various times over her course of treatment. It was therefore reasonable for the state appellate court to conclude that her notes demonstrated that G.S. suffered from anxiety and nightmares, even though they did not include the precise verbiage that Karim used at trial.

Petitioner also contends that the state appellate court made an unreasonable factual determination when it relied on Karim's testimony from the postconviction evidentiary hearing that G.S.'s prior diagnosis of PTSD would not have affected her diagnosis. (Dkt. 2, p. 44.)

Karim, however, made key points in her testimony that supported this assertion. She testified that individuals can suffer PTSD at various points in their lives following different events, (Dkt. 10-17, p. 185), a point with which Dr. Cooper agreed, *id.* at 125-26, and that there is a greater risk of PTSD upon multiple exposures to trauma. *Id.* at 182. Further, the record does not demonstrate that G.S.'s prior PTSD diagnosis was perfectly sound. Ahlquist saw G.S. a total of

two times and conceded that she was "looking for" PTSD when she was introduced to G.S., as another doctor's report had suggested this diagnosis. *Id.* at 26, 28-29.

Karim, on the other hand, treated G.S. for a year and a half, a period of time longer than the requisite timeframe to make a PTSD diagnosis under the DSM as Dr. Cooper so explained, (Dkt. 10-17, p. 78), and testified that G.S. exhibited all of the symptoms of PTSD during that period. *Id.* at 184. In light of this evidence, it was not unreasonable for the state appellate court to highlight Karim's assertion that her diagnosis would not have changed even had she known of G.S.'s earlier diagnosis.

Finally, Petitioner argues that the state appellate court unreasonably relied on Karim's testimony that she did not view herself as an advocate for her patients in rejecting his claim that he was prejudiced by counsel's failure to delineate to the jury her "dual role" as an expert and as G.S.'s therapist. (Dkt. 2, p. 30.) The Court rejects this contention.

The theory that Karim, as G.S.'s therapist, would have been acting as her advocate, came from Dr. Cooper. *Id.* at 114. Karim clearly did not agree with this theory, as she testified that she saw her role not as an advocate; but as a provider, helping her patients get better through treatment. *Id.* at 204. In any event, the jury was well aware that Karim was G.S.'s therapist. Beyond that, the jury knew that Karim's practice group was on a referral list for the CAC; that G.S. had been referred to Karim following her interview with Heilemeier; that Karim already knew an incident had occurred when G.S. was first introduced to her; and that Karim had spoken to law enforcement about the case. (Dkt. 10-16, p. 82, 88.) From this evidence, a reasonable inference could be drawn regarding Karim's biases, and the failure to press further as to her "dual role" was not so potent as to constitute *Strickland* prejudice. The state appellate court's rejection of Petitioner's ineffective assistance of counsel claim on this point was therefore reasonable.

### 4.    Petitioner is Not Entitled to Habeas Corpus Relief

In sum, Petitioner is not entitled to § 2254 relief on his ineffective assistance of counsel claims. Petitioner's case involved the statements of G.S., a young girl who recounted how Petitioner climbed into a lofted bed with her, pulled down her pants to her ankles, and sexually assaulted her through oral stimulation, digital penetration, and rubbing her feet on his penis. She repeated these statements to her mother, to Dr. Davis, and to Heilemeier. The jury heard from G.S. herself and the individuals to whom she made her subsequent disclosures.

Karim was called as a witness not to testify regarding a subsequent disclosure made by G.S., but to testify regarding the trauma she experienced following the incident. That Petitioner's counsel did not adequately investigate and cross-examine Karim's PTSD diagnosis may have constituted deficient performance, but Petitioner cannot show a reasonable probability that the absence of these deficiencies would have resulted in a different outcome amid the live testimony and video evidence of G.S. recalling the abuse. Petitioner therefore cannot meet AEDPA's highly deferential standard for habeas corpus relief; nor could he under a *de novo* standard of review. *See* 28 U.S.C. § 2254(a) (providing that a state prisoner is entitled to federal habeas corpus relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States"). For all the reasons discussed above, Petitioner's habeas corpus petition (Dkt. 2) is denied.

## III.    Certificate of Appealability

Under the AEDPA, a certificate of appealability "may not issue 'unless the applicant has made a substantial showing of the denial of a constitutional right.'" *Slack v. McDaniel*, 529 U.S. 473, 483 (2000) (quoting 28 U.S.C. § 2253(c)). This requires Petitioner demonstrate that reasonable jurists could debate whether this Court should have resolved Petitioner's claims differently or that the issues were "adequate to deserve encouragement to proceed further."

*Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing *Slack,* 529 U.S. at 484) (quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)). Petitioner has not made the requisite showing. The Court therefore declines to issue a certificate of appealability.

## IV.    Conclusion

Petitioner's habeas corpus petition (Dkt. 2) is denied on the merits. Any pending motions are denied as moot. The Court declines to issue a certificate of appealability. The Clerk is instructed to enter a judgment in favor of Respondent and against Petitioner. Civil Case Terminated.

ENTERED:

Dated: July 12, 2023

IAIN D. JOHNSTON
United States District Judge